

FILED
JUN 21 2016
CLERK

United States District Court
District of South Dakota
Southern Division

| | |
|---|---|
| O.M.L. a minor, by Michael J. Streit, her Guardian Ad Litem, and Misty Ericson, <br><br> Plaintiffs, <br><br> vs. <br><br> Sanford Health, Sanford Medical Center d/b/a Sanford USD Medical Center, Sanford Clinic, and Anesthesia Physicians, Ltd. <br><br> Defendants. | Case No.: 16-cv-4086 |

## Complaint

Plaintiffs, for their Complaint and cause of action against the above-named Defendants, state and allege as follows:

**Parties**

1. O.M.L. is nine years old. She lives with her mother, Misty Ericson, in Sioux City, Iowa.

2. Michael J. Streit was appointed O.M.L.'s Guardian Ad Litem by order of the Minnehaha County District Court on December 31, 2015.

3. Defendant Sanford Health is a South Dakota corporation with its principal place of business located in Sioux Falls. It is one of the largest health systems in

the nation, with 43 hospitals and nearly 250 clinics in nine states and three countries.

4. Defendant Sanford Health is a parent company with several subsidiaries that act together in the medical treatment of patients within the health system.

5. Medical care at issue in this case took place at Sanford Children's Castle of Care ("Sanford Children's"), a children's hospital in Sioux Falls that is part of Defendant Sanford Health's health system.

6. At all times relevant to this case, Sanford Children's had a pediatric intensive care unit ("PICU"). Sanford claims that its PICU is "designed and equipped with the latest in technology to support the critical care needs of children with life-threatening illnesses and injuries or those in need of close monitoring." Sanford also claims that its PICU is led by pediatric intensive care physicians, who are "available 24/7 at Sanford Children's Hospitals."

7. Sanford Children's is a facility operated by Defendant Sanford Medical Center d/b/a Sanford USD Medical Center ("Sanford Medical Center"), a South Dakota corporation with its principal place of business in Sioux Falls.

8. While patients and their guardians at Sanford Children's may be aware that care providers at the facility are affiliated with the Sanford system, they receive medical treatment from professionals employed by multiple different entities.

9. One entity that employs healthcare providers at Sanford Children's is Defendant Sanford Medical Center, which, upon information and belief, and based upon representations made by Sanford's counsel, employs the nursing staff at Sanford Children's.

10. Another entity that employs healthcare providers at Sanford Children's is Defendant Sanford Clinic. Defendant Sanford Clinic is a South Dakota corporation with its principal place of business in Sioux Falls. Upon information and belief, and based upon representations made by Sanford's counsel,

2

Defendant Sanford Clinic employs physicians who treated patients in the Sanford Children's PICU at the time of these events.

11. Upon information and belief, and based upon representations made by Sanford's counsel, Defendant Sanford Medical Center employed the nurses and nurse anesthetists who provided care and treatment to O.M.L. at the time of the events referenced in this Complaint.

12. Defendant Sanford Medical Center is liable for negligent medical treatment that its employees – including nurses and nurse anesthetists – provided to O.M.L. while she was a patient at Sanford Children's.

13. Upon information and belief, and based upon representations made by Sanford's counsel, Defendant Sanford Clinic employed physicians who provided care and treatment to O.M.L. at the time of the events referenced in this Complaint.

14. Defendant Sanford Clinic is liable for negligent medical treatment that its physicians provided to O.M.L. while she was under their care.

15. Defendant Anesthesia Physicians, Ltd. is a South Dakota corporation with its principal place of business in Sioux Falls. It is the anesthesia physicians' group serving Sanford USD Medical Center.

16. Defendant Anesthesia Physicians, Ltd. employed the anesthesiologists who provided care to O.M.L. at the time of the events referenced in this Complaint.

17. Defendant Anesthesia Physicians, Ltd. is liable for negligent medical treatment that its anesthesiologists provided to O.M.L. while she was under their care.

## Jurisdiction and Venue

18. O.M.L.'s past and future damages are enormous, and the matter in controversy in this case far exceeds $75,000.

19. Plaintiffs and Defendants are citizens of different states.

20. This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1332, and venue is appropriate pursuant to 28 U.S.C. §1391.

## Facts

21. O.M.L. was born in 2006. She had a number of health problems early in her life, including difficulties with her airway. O.M.L.'s airway difficulties – for which she received treatment from ENT doctors at Sanford – eventually required a tracheostomy.

22. In September of 2013 one of Sanford's ENT doctors, Patrick Munson M.D., advised Ms. Ericson about a surgery called single-stage laryngotracheal reconstruction (SSLTR). SSLTR is a complex surgery that is performed to treat certain airway complications. Dr. Munson suggested the surgery as a method to surgically reconstruct O.M.L.'s airway so she would no longer require the tracheostomy.

23. Dr. Munson discussed the possibility of SSLTR with Ms. Ericson several times over the ensuing months. On July 9, 2014, O.M.L. was admitted to Sanford, where Dr. Munson performed a tracheal reconstruction.

24. Following surgery, O.M.L. remained orally intubated and was monitored in the Sanford Children's PICU for six days as her tracheal graft healed.

*Removal of Breathing Tube and Arrest*

25. On July 15, 2014, Dr. Munson took O.M.L. to the operating room to remove her endotracheal tube. After she was extubated, O.M.L. was able to breathe spontaneously and was allowed to awaken from anesthesia.

26. At some point shortly after the removal of the breathing tube, O.M.L.'s breathing became obstructed and her oxygen saturations began to decrease. An anesthesiologist applied positive pressure to assist with ventilation, but her saturations continued to fall. Her heart rate and blood pressure also began to fall.

27. The team in the operating room – which included agents and employees of Defendants Sanford Medical Center, Sanford Clinic, and Anesthesia Providers, Ltd. – failed to re-establish adequate oxygenation for a period of minutes, and then only by cutting into the tracheal graft and placing an endotracheal tube.

28. Dr. Munson suspected that O.M.L.'s persistent hypoxia and bradycardia had occurred because she had been allowed to aspirate a "massive amount" of gastro-mucoid secretions into her lower airway and lungs.

29. O.M.L. was taken from the operating room to the recovery room, and then returned to the PICU at approximately 1 p.m. An intensivist evaluated her and noted that her intraoperative arrest was thought to be due to aspiration.

*Second Arrest in the PICU*

30. At around 5:30 p.m. the evening of the 15th, a nurse in the PICU reduced the amount of sedation that O.M.L. was receiving to assess her neurological status. The nurse noted that O.M.L. opened her eyes, squeezed her parents' fingers on command, and moved both arms purposefully to her face. The nurse also noted that O.M.L. had normal tone of her legs and that her feet moved freely with passive range of motion after initially displaying clonic movement when flexed.

5

31. At approximately 8:38 p.m., a nurse entered O.M.L.'s room to check on her ventilation alarm. A close family friend was rubbing her head and told the nurse that O.M.L. had "coughed." The nurse could not get a suction catheter passed and could not get O.M.L. ventilated with a bag mask, so a code was called.

32. When a code is called in the Sanford Children's PICU, an alarm is activated in the unit and the "code team" – consisting of physicians and other health care providers trained to resuscitate pediatric patients – are supposed to immediately respond. A specific record is kept of the minute-by-minute actions that are taken to resuscitate the patient. This detailed record is called the "Code Blue Resuscitation Record."

33. According to the Code Blue Resuscitation Record, a code was called for O.M.L. at 8:40 p.m. At that time O.M.L.'s oxygen saturation was 27% and her heart rate was 122. At 8:42 p.m. O.M.L.'s saturations were 0% and her heart rate had fallen to 57.

34. For the next seventeen minutes – until 8:59 p.m. – the doctors and nurses attending to O.M.L. failed to re-establish her airway or adequately oxygenate her. A neonatologist named Dr. Messier tried and failed to ventilate her by passing an endotracheal tube through her mouth. An intensivist named Dr. Ali tried and failed to resuscitate O.M.L. by sticking a needle in her chest.

35. Throughout those seventeen minutes from 8:42 p.m. to 8:59 p.m., O.M.L.'s oxygen saturation was 0%.

36. At 8:59 p.m. an anesthesiologist named Dr. Ryan Rowberry – an employee or agent of Anesthesia Providers, Ltd. – removed O.M.L.'s tracheostomy tube – which had either become dislodged or plugged – and placed a new tube. This improved O.M.L.'s ventilation and oxygenation almost immediately.

37. Dr. Munson arrived at 9:00 p.m. At 9:19 p.m., after a portable chest x-ray was performed, he placed a slightly larger tracheostomy tube.

6

38. O.M.L. was deprived of adequate oxygen for nearly twenty minutes during the code.

39. O.M.L. was kept sedated for the next few days. Subsequent diagnostic tests, including an EEG on July 20 and an MRI on July 21, demonstrated that O.M.L. had suffered a global hypoxic injury to her brain.

40. On August 11, O.M.L. was transferred from Sanford to the Madonna Rehabilitation Hospital in Nebraska. She spent nearly seven months there.

41. As a result of her hypoxic brain injury, O.M.L. has severe static encephalopathy and global neurodisability due to severe hypertonic, dyskinetic motor impairment. She is totally dependent on others for care. She cannot speak. She is fed exclusively via GJ tube with continuous feedings for 21 of 24 hours per day. O.M.L. is unable to move her wrists or her fingers to grab objects and cannot play with toys, manipulate utensils or use her hands for exploration of objects. She has constant involuntary, dyskinetic (choreo-athetotic) movements of her tongue, arms and trunk. Her condition is permanent.

## Count 1: Medical Negligence

42. Plaintiffs reallege and restate the allegations contained in all paragraphs above.

43. Defendants and their agents and employees had a patient/provider relationship with O.M.L.

44. The medical care and treatment Defendants and their agents and employees provided to O.M.L., as outlined above, was negligent and failed to meet accepted standards of medical practice.

45. The negligent medical care that Defendants and their agents and employees provided to O.M.L. was a direct cause of O.M.L.'s extensive, catastrophic, and permanent neurologic injuries.

46.   Defendants are directly and vicariously liable for any negligent health care that its employees and agents provided in their care and treatment of O.M.L.

47.   Defendants are directly liable for any negligent education or training that was provided to its employees or agents.

### Damages

48.   As a direct and proximate result of the negligence described above, O.M.L. has sustained severe, disabling, and permanent injuries that have caused pain, suffering, physical impairment, disability, disfigurement, mental anguish, emotional distress, fear of further injury, loss or illness, loss of a substantial portion of her prior enjoyment of the amenities of life, and all other damages recoverable under S.D.C.L. § 21-1-1, all to her non-economic damage in a sum to be proved at trial but well in excess of $75,000.

49.   As a further direct and proximate result of the negligence described above, O.M.L. has incurred and will in the future incur expenses for medical care, and all other damages recoverable under S.D.C.L. § 21-1-1, all to her economic damage in a sum to be proved at trial but well in excess of $75,000.

50.   As a further direct and proximate result of the negligence described above, O.M.L. will in the future suffer a loss of earnings, income, support, employment, business or employment opportunities, a complete loss of earning capacity, and all other damages recoverable under S.D.C.L. § 21-1-1, all to her economic damages in a sum to be proved at trial but well in excess of $75,000.

51.   As a further direct and proximate result of the negligence described above, Plaintiff Misty Ericson has incurred, and will in the future incur, emotional distress and damages for the loss of O.M.L.'s services and for the reasonable value of medical, nursing, attendance, and other consequential damages incurred in caring for O.M.L.

### Prayer for Relief

WHEREFORE, O.M.L. a minor, by Michael J. Streit, her Guardian Ad Litem, and Misty Ericson, ask for judgment against Defendants in an amount in excess of seventy-five thousand dollars, together with costs, interest and such other and further relief as the Court deems just and appropriate under the circumstances.

ROBINS KAPLAN LLP

Dated: June 21, 2016

By: _____
Brendan V. Johnson (S.D. Bar No. 3263)
*BJohnson@RobinsKaplan.com*
Brandon Thompson
*BThompson@RobinsKaplan.com*\*
Patrick Stoneking
*PStoneking@RobinsKaplan.com*\*

800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402-2015
612-349-8500

\*Pro Hac Vice status is being applied for.

AND

BLACKBURN & STEVENS, PROF LLC
John Blackburn (S.D. Bar No. 130)
100 West 4th Street
Yankton, SD 57078-4308
605-665-5550
*jblaw@iw.net*

*Attorneys for Plaintiff*